# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 22, 2003 Session

## ROGER DALE LEWIS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sumner County**
**No. 9552     Jane Wheatcraft, Judge**

---

**No. M2002-02439-CCA-R3-PC - Filed October 28, 2003**

---

Roger Dale Lewis, the petitioner, appeals the dismissal of his petition for post-conviction relief by the Sumner County Criminal Court.  Through his petition, the petitioner sought to collaterally attack his aggravated arson conviction on the grounds of ineffective assistance of counsel and due process violations in the nature of suppression of exculpatory evidence and prosecutorial misconduct.  After consideration of the entire record, we affirm the post-conviction court=s disposition.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

Thomas Edward Nelson, Nashville, Tennessee, for the Appellant, Roger Dale Lewis.

Michael E. Moore, Solicitor General; Kathy D. Aslinger, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and C. Wayne Hyatt, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The procedural history of this Sumner County post-conviction case is rather convoluted; fortunately, however, the underlying facts are relatively straightforward.  The petitioner stands convicted of one count of aggravated arson for which he received an effective sentence of 21 years= imprisonment, as a Range I offender with a 30 percent release eligibility date.  Evidently, the petitioner is currently on parole from that sentence.

The circumstances leading to the petitioner=s conviction are set forth in *State v. Roger Lewis*, No. 01C01-9404-CR-00135 (Tenn. Crim. App., Nashville, Jan. 12, 1995).

In May 1992, appellant Lewis was asked to move out of his apartment because he had not paid the rent. He threatened retaliation against the landlord. On June 5, 1992, the Cheryl Apartments, located in Hendersonville, Tennessee burned in an arson fire.

Lewis had been in his apartment on June 4, 1992, in the process of moving items out of the dwelling. On June 5, at about 3:00 a.m., Lewis was in the vicinity of the apartment. At about 3:15 a.m. the residents of the apartment directly below Lewis' apartment heard "stomping noises" emanating from upstairs. Shortly after that, one of the residents saw Lewis' car being driven away from the apartment complex. Then the fire alarm sounded and the fire department arrived at the complex at 3:36 a.m. Although all of the tenants were evacuated safely, there was extensive damage; and the entire top of the Cheryl Apartments was engulfed in flames. Five apartments were destroyed.

The evidence showed that Lewis returned to his new residence at about 4:00 a.m. on June 5, 1992, and made two telephone calls to two different nurses who apparently were working late on their shifts. One of the nurses thought that it was odd that Lewis mentioned gasoline several times during the conversation.

After an investigation, the fire marshal determined that an accelerant was used to start the fire. The fire began in the living room of Lewis' apartment in the floor area. The electricity had been disconnected in the apartment, and there was no wiring in the area where the fire started. The fire was not an accident, but the investigators could not positively determine the type of accelerant that was used.

During the investigation which lasted for several months, Lewis was interviewed and reinterviewed by the fire marshal or other authorities. Lewis made several inconsistent statements about where he had been on the night in question. Some of his alibi witnesses, particularly the nurses, did not corroborate his time frame of reference so as to eliminate him as a suspect. Lewis claimed that he had lost many items in the fire in his apartment when in fact he had not. In October 1992, authorities searched

Lewis' new residence and discovered many items such as coins, cookware, and electronic equipment which he had claimed were lost in the fire. Additionally, a plastic jug was seized from Lewis' car during the investigation. A forensic scientist tested the jug and concluded that it had contained gasoline.

One of the prosecution's witnesses, Ernest Bishop, testified that he was in the Sumner County Jail and was Lewis' cell mate. Bishop testified that he heard Lewis say that he had moved some of his possessions out of his apartment, picked up a gallon jug of gasoline, poured gasoline in the ceiling, and then lit his lighter which started the fire. According to the prosecution's theory, however, Lewis had planned to leave the gasoline in the ceiling so that when the electricity was reconnected, a fire would start when someone turned on the lights. Apparently Lewis made a stupid, and potentially deadly, mistake. When he flicked his lighter so that he could see the way out of the apartment, the gas that he had spilled on the floor caught fire.

A detective interviewed Lewis and pointed out that the time frames for his alibi did not coincide. During one of the conversations, according to the detective, "the defendant became very emotional to the point of crying and told me that the evidence was so great that he might as well plead guilty." Apparently Lewis repeated this to the detective several times during the course of the interview.

*Id.,* slip op. at 2-4.

The jury that heard this evidence convicted the petitioner of five counts of aggravated arson -- one conviction for each of the five apartments destroyed in the fire. The trial court imposed an effective sentence of thirty years. Aggrieved by his convictions and sentence, the petitioner appealed. The petitioner's convictions and sentence were affirmed by our court on January 12, 1995. *State v. Roger Lewis*, No. 01C01-9404-CR-00135 (Tenn. Crim. App., Nashville, Jan. 12, 1995). The supreme court denied permission to appeal on November 12, 1995.

On February 13, 1996, the petitioner then embarked upon a collateral attack of his convictions and sentence by filing a petition for post-conviction relief. In *State v. Lewis*, 958 S.W.2d 736 (Tenn. 1997), the post-conviction appeal, the supreme court reversed four of the

petitioner's aggravated arson convictions as barred by double jeopardy and remanded for resentencing on the remaining conviction. *Id*. at 739-40.[1]

Evidently, upon remand, the petitioner received a 21-year sentence. That sentence was appealed and affirmed by our court, *State v. Roger Dale Lewis*, No. M1998-00543-CCA-R3-CD (Tenn. Crim. App., Nashville, Dec. 30, 1999), and by the supreme court, *State v. Lewis*, 44 S.W.3d 501 (Tenn. 2001). The latter part of 2001 then saw a revival of post-conviction proceedings. Two amendments to the petition were filed, and hearings were held in March and May of 2002 on the petitioner's claims. On August 30, 2002, the post-conviction court dismissed the petition by written Memorandum Opinion and Order. From that dismissal, the petitioner has appealed, and the matter is before us on review of the disposition of the post-conviction claims.

Petitioners seeking post-conviction relief must prove their allegations by "clear and convincing evidence." Tenn. Code Ann. § 40-30-210(f) (1997). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). An appellate court is bound by a trial court's findings of fact unless the facts of record preponderate against those findings. *Id*. Questions concerning the credibility of witnesses and the weight given the testimony of witnesses are resolved by the trial court. *Bates v. State*, 973 S.W.2d 615, 613 (Tenn. Crim. App. 1997).

## I. Ineffective Assistance of Counsel.

The petitioner first insists that his trial counsel provided constitutionally ineffective representation and that the post-conviction court incorrectly found that trial counsel was "competent, prepared and effective."

When seeking post-conviction relief on the basis of ineffective assistance of counsel, a petitioner must establish that the services rendered or the advice given fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). He or she must also show that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

---

[1]The record before us in the present case does not show the post-conviction court's treatment of the post-conviction claim. The only explanation of the procedural posture of the petitioner's case is the following statement by the supreme court in its opinion: "We granted Lewis' application for review under Tenn. R. App. P. 11 and Tenn. R. Crim. P. 52(b) in order to determine whether the Double Jeopardy Clauses of the United States and Tennessee Constitutions bar multiple convictions for aggravated arson of a single structure containing several apartment units." *Lewis*, 958 S.W.2d at 738. The post-conviction court's written opinion and order denying relief, which is before us, recites that after the petition for post-conviction relief was filed, the petitioner sought and was granted a delayed appeal to the supreme court.

*Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2067 (1984); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Both of the above prongs must be established for a petitioner to be entitled to relief. *Goad*, 938 S.W.2d at 370.

Generally, a petitioner may not obtain relief based upon a sound, though unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad*, 938 S.W.2d at 369. However, this deference to the tactical decisions of counsel only applies to those choices made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

During the post-conviction evidentiary hearings in this case, only two witnesses testified: the petitioner and former trial counsel. The petitioner testified that he borrowed $3,000 from his parents to retain trial counsel to represent him on the aggravated arson charges. Petitioner said that at a later time, counsel's secretary contacted his mother and requested an additional $1,000 for an arson expert.

Regarding pretrial preparation, the petitioner testified that he only met briefly with trial counsel twice and that they "talked on the phone a couple of times." The petitioner, however, admitted that he was working out of town most of the time while the charges were pending. The petitioner said that trial counsel encouraged him not to worry about the case because "they don't have any evidence." The petitioner suggested that counsel misled him about his trial date. The petitioner testified that he received a notice that his case had been set for trial in late February 1993. Based on communications from counsel's office, the petitioner said that he believed that the trial would be continued until May or June because of scheduling conflicts. Then, according to the petitioner, on March 2, 1993, he was contacted in Louisiana, where he was working, and told to come back to Tennessee because the case was set for trial on March 9, 1993.

The petitioner did not recall seeing any of the state's discovery until the trial began. He claimed that trial counsel told him about a fire investigator, but the petitioner said that he never met the investigator. At trial, the petitioner offered no expert witnesses regarding the fire. The petitioner testified that he provided witness names to counsel, including an "alibi" witness, Carol Hoard. Ms. Hoard was a clerk at the Dodge Store in Hendersonville; the store is approximately a four-minute drive from the Cheryl Apartments. When the police interviewed the apartment manager, Karen Evans, she reported seeing the petitioner's automobile leaving the apartment parking lot between 3:15 and 3:20 a.m. At approximately 3:30 a.m., other apartment residents alerted Ms. Evans about the fire, and Ms. Evans called the Hendersonville police department at 3:34 a.m. to report the fire. Through Carol Hoard, the petitioner maintained that he could prove that he was buying beer and potato chips at the Dodge Store shortly before 3:00 a.m. and talked to Ms. Hoard for eight to ten minutes.

The petitioner testified that his attorney failed to investigate his alibi. The petitioner said that his attorney told him that it would be improper to try to question Ms. Hoard because she was listed as a witness for the state and that, for similar reasons, the attorney could not go to the Dodge Store. The petitioner testified that after trial, he learned that counsel had, in fact, filed an alibi notice, but the alibi witness named was Kim Stevens, not Ms. Hoard. To the petitioner's knowledge, his attorney never met with any defense witnesses. As events developed at trial, the state did not call Ms. Hoard to testify, and the petitioner testified that he had been unable to locate her since the trial. Shortly after the jury's guilty verdicts, the petitioner relieved trial counsel from further representation.

The petitioner sharply criticized counsel's performance involving Ernest Bishop, who testified about the petitioner's inculpatory statements made to Bishop while the two men were cell mates in the Sumner County jail. The petitioner testified that when he was taken into custody after the guilty verdict, he learned from inmates and deputy jailers that Bishop was a "jailhouse snitch" who frequently testified for the state. The petitioner said that one deputy remarked, "We'll have to build another jail to find a room to put [Bishop] where [he] hasn't testified against somebody." The petitioner also said that later on, further investigation revealed that, prior to and after the petitioner's trial, Bishop had been a witness in a federal drug prosecution, had testified in another trial in exchange for sentencing leniency, and had testified in Kentucky that a cell mate had confessed to murdering a deputy sheriff.

The petitioner testified that he knew nothing about Bishop until his attorney handed him a "mug sheet" in court and told the petitioner that Bishop was going to testify about statements the petitioner had made to Bishop in jail. The petitioner said that he told trial counsel that he did not know Bishop. The petitioner claimed that trial counsel's efforts to impeach Bishop's testimony were ineffective. The petitioner said that trial counsel had not investigated Bishop's prior record and that when the petitioner told counsel to check Bishop's criminal record through the National Crime Information Center (NCIC), counsel replied that they could not get that information. The petitioner claimed that trial counsel only asked Bishop about a pending charge in Texas, whereas an investigation subsequent to the petitioner's conviction uncovered evidence that Bishop had an extensive criminal history and that he used numerous aliases, false social security numbers, and false dates of birth.

The last matter that the petitioner covered in his post-conviction testimony was trial counsel's failure to secure various tape recordings. According to the petitioner, one such tape recording was played, in part, for the jury. That tape recorded the petitioner leaving a message on Kim Stevens' answering machine. In the message, the petitioner told Stevens that there had been a police problem, that he had given her name to an investigating officer, Detective Coarsey, and that she needed to call the petitioner before she spoke with the police. Another tape recording that the petitioner testified should have been, but was not, played for the jury was of a conversation between the petitioner and his former girlfriend. The girlfriend

testified at the petitioner's trial that she had spoken with the petitioner twice after the fire and that he had mentioned gasoline several times. The petitioner said that there was a taped conversation with the former girlfriend during which he denied being involved in the apartment fire.

The petitioner's former counsel testified and disputed many of the post-conviction claims. Counsel began by testifying that his fee to represent the petitioner was $4,000, not $3,000. Counsel recalled that he did speak with an arson expert about the case but that the expert provided no useful information to offer at trial. As for witnesses who were the petitioner's family members, counsel explained that because they were character witnesses, not fact witnesses, he had no reason to meet with them pretrial.

Counsel also remembered that he listened to tapes made available by the state. He testified that he heard nothing useful on the tapes; consequently, he did not request that the tapes be duplicated. Counsel denied telling the petitioner that the defense could not interview state witnesses and denied telling the petitioner not to worry about the case because the state had no evidence. Counsel listed his concerns for the case as being the witness who saw the petitioner leaving the apartment parking lot, the evidence about the petitioner's animosity toward the apartment complex, and the police recovery of items of the petitioner's property that allegedly had been destroyed in the fire. The theory of defense, counsel testified, was factual, premised on the arguments that the petitioner did not have sufficient time to commit the arson, that Bishop's testimony did not make sense, and that the state was unable to prove that an accelerant was used to start the fire.

Regarding the petitioner's alibi witness, Carol Hoard, counsel testified that he tried but was unable to locate her. Even so, counsel explained that the state had agreed that the petitioner was at the Dodge Store at 2:59 or 3:00 a.m. Counsel also pointed out that he argued the petitioner's alibi theory of defense to the jury; he said that he went into detail with the jury that the petitioner could not have committed the arson even if he left the Dodge Store at 3:00 a.m. because it would have taken him much longer than fifteen to twenty minutes to drive to the apartment, set up and ignite the fire, and be seen driving away at 3:15 or 3:20 a.m.

Trial counsel was asked about the alibi notice actually filed, which identified Kim Stevens as an alibi witness. He explained that the notice was based on the petitioner=s claim that at 3:30 a.m. on the morning of the fire, the petitioner was talking on the telephone with Ms. Stevens, who worked at the Portland Hospital. When, however, trial counsel later interviewed Ms. Stevens, she denied speaking with the petitioner at 3:30 a.m. Moreover, trial counsel recalled that the police had interviewed Ms. Stevens, and she advised the police -- and later testified for the state at trial -- that the petitioner called her at about 4:20 a.m. that morning.

Trial counsel admitted that he did not independently investigate Bishop=s background, but counsel did recall offering a jail photograph of Bishop at trial so the jury could

compare his appearance in the photograph with his appearance when testifying. Trial counsel testified that A[a]fter looking at and listening to what [Bishop] said and looking like he did, I felt I could discredit the testimony enough for the jury.@ Nevertheless, counsel submitted that it was a mistake on his part not to have obtained a NCIC report on Bishop, and counsel acknowledged that inasmuch as Bishop was evasive and lied about his prior convictions, his credibility could have been further attacked with an NCIC criminal history report. Counsel was uncertain whether further impeachment of Bishop would have affected the outcome of the trial.

Based on the evidence and testimony, the post-conviction court examined both prongs of *Strickland* and concluded that the petitioner had not demonstrated that he received constitutionally ineffective representation. The post-conviction court clearly articulated its findings, which are supported by the record and from which we quote:

> Trial counsel filed a pre-trial Discovery Motion, a Motion to Suppress and a Notice of Alibi. Counsel testified at the Post-Conviction hearing that he interviewed every single witness he could find. The testimony of the witnesses did not corroborate the story Petitioner had told the police about his whereabouts at the time of the fire. [Counsel=s] failure to call said witnesses was not error. The Petitioner criticizes counsel for not interviewing the clerk at the Dodge Store, who apparently disappeared shortly after the incident. There was no harm in his failure to interview the clerk, however, since the State stipulated that the Defendant was at the Dodge Store, four (4) minutes from Cheryl Apartments, at 3:00 a.m. Also harmful to the Petitioner=s case was testimony of an eyewitness who saw Petitioner=s car leaving the Cheryl Apartments at the time the fire was discovered. The main defense asserted, quite properly, by the defense attorney was that there was simply not enough time for the Defendant to have left the store, gone to the apartment and started the fire. The timeline was the critical element of the defense case and it was placed squarely before the jury which decided against the Petitioner.

Regarding how trial counsel handled cross-examination of Bishop, the post-conviction court focused on the petitioner=s failure to prove the prejudice prong of *Strickland*. It is undisputed that trial counsel attacked Bishop=s credibility. No doubt, Bishop=s NCIC report could have proven helpful in that endeavor but not to the extent required to establish a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. Even without Bishop=s testimony, the state, for instance, had eyewitness testimony, which was not discredited, placing the petitioner=s car leaving the apartment complex at 3:15 a.m.

On appeal, the petitioner directs our attention to trial counsel=s retainer fee, which the petitioner characterizes as Anominal@ and, therefore, suggestive that trial counsel did not anticipate taking the case to trial. The petitioner also renews his complaints about trial counsel=s preparedness, failure to locate alibi witness Carol Hoard, naming the wrong alibi witness in the notice that was filed, and investigation of Bishop=s background. None of the petitioner=s rather cursory arguments convinces us that we should reverse the post-conviction court=s dismissal of his petition. It is evident from the record that the petitioner=s time line defense was prepared and presented to the jury that convicted him. The petitioner does not argue that a different defense theory should have been investigated or pursued.

## II. <u>Brady Claim.</u>

The petitioner challenges the state=s failure to disclose to trial counsel Bishop=s NCIC report and Bishop=s reputation as a Ajail house snitch.@

In *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused=s guilt or innocence and the punishment that may be imposed. Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution. *Id*. at 87, 83 S. Ct. at 1196-97.

Decisions subsequent to *Brad*y have established that to prove a due process violation, the defendant must show that the information was requested (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not), that the state suppressed the information, that the information was favorable to the accused, and that the information was material. *State v. Edgin*, 902 S.W.2d 387, 389-90 (Tenn. 1995); *see Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999) (AThere are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). The suppressed information is considered Amaterial" if there is a Areasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). A Areasonable probability," the Supreme Court has explained, is a probability sufficient to Aundermine[ ] confidence in the outcome" of the trial. *Id*., 105 S. Ct. at 3383.[2]

---

[2] In formulating this materiality standard, the *Bagley* Court explained that it was adopting the definition of Areasonable probability@ that was articulated in *Strickland v. Washington* in the context of ineffective assistance of counsel claims. *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383.

Our review of the post-conviction court's memorandum opinion convinces us that the post-conviction court implicitly found that the first two requirements were demonstrated. Trial counsel testified, without contradiction, that pretrial he filed a request for the state to produce all exculpatory *Brady* material. The state, however, according to trial counsel did not turn over information about Bishop's extensive prior criminal history, his aliases, or his reputation as a Ajail house snitch." The state has offered no explanation why the information was not provided to the defense, but inasmuch as the prosecution's good faith or bad faith is irrelevant to a claim that exculpatory evidence was suppressed, no significance attaches to the state's silence on this point.

Although the post-conviction court did not comment on the favorable quality of the information that was withheld, it appears self-evident to us that the third requirement has been met. Impeachment evidence is treated no differently than other evidence in terms of exculpatory significance. "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 675, 105 S. Ct. at 3380. Impeachment evidence is "'evidence favorable to an accused,' . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.*, 105 S. Ct. at 3380. In this case, the information about Bishop is imbued with impeachment value; consequently, it qualifies as evidence "favorable" to the defendant. The final step is to determine if this favorable evidence is Amaterial," such that its suppression violated due process.

The post-conviction court did address the materiality requirement:

> There have been cases . . . where failure to supply the defense with prior criminal histories of state's witnesses has required reversal. In those cases, however, the cases usually turned on the testimony of those witnesses. That is not true in the case at bar. The State had a great deal of both direct and circumstantial evidence against this Petitioner. Ernest Bishop was not a significant part of the State's case. Further, the jury knew he was incarcerated and there were charges pending in another jurisdiction. . . . Bishop appears from the record to have played a minor role in this case and failure by the State to provide an NCIC report does not in and of itself warrant reversal of this conviction.

On appeal, the petitioner contests the court's statement that Bishop was not a significant part of the state's case. That argument, however, is not dispositive.

The "materiality" of suppressed, favorable evidence was discussed at length in *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995), and *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001). Four aspects are highlighted in those cases. First, materiality does not demand a showing by a preponderance that the suppressed evidence would have resulted in the defendant's

-10-

acquittal. *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 58. Second, materiality is not an evidence sufficiency test. *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 58. Third, once constitutional error has been found, there is no need for further harmless-error review. *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1566; *Johnson*, 38 S.W.3d at 63. Last, the "suppressed evidence [is to be] considered collectively, not item by item" to gauge materiality. *Kyles*, 514 U.S. at 436, 115 S. Ct. at 1567. Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435, 115 S. Ct. at 1566; *see Johnson*, 38 S.W.3d at 58.

The petitioner in this case fails to enlighten us how further impeachment of Bishop would have put the whole case in such a different light as to undermine confidence in the jury's verdict. The petitioner lambasts the state for engaging in "treachery," but the prosecution=s good faith or bad faith is irrelevant, as we previously noted. The petitioner also argues at one point that there should be a *per se* conviction-reversal rule if the prosecution fails to fully disclose the prior criminal history of its witnesses. The Supreme Court, however, rejected an automatic reversal rule in *Bagley*, 473 U.S. at 676-77, 105 S. Ct. at 3380-81, and Tennessee has not adopted such an approach.

We disagree with the post-conviction court that Bishop was not a "significant part" of the state's case, but we also are not convinced that Bishop's testimony was essential to the state's case. Even without Bishop's testimony, the state had a strong case against the petitioner. The fire originated in the petitioner's apartment from which he was being evicted for nonpayment of rent. Shortly before the fire started, residents in the apartment below the petitioner's apartment heard "stomping noises" upstairs. The petitioner's automobile was seen leaving the parking lot of the apartment complex between 3:15 and 3:20 a.m. The fire was discovered at approximately 3:30 a.m., and the police were notified at 3:34 a.m. A plastic jug that had contained gasoline was confiscated from the petitioner's automobile, and while executing a warrant to search the petitioner's new residence, the police discovered many items that the petitioner had alleged were destroyed in the fire.

Moreover, we have reviewed Bishop's testimony at the petitioner's trial. The state brought out that Bishop was awaiting a sentencing hearing on theft and false police report convictions. Bishop was patently evasive on cross-examination when asked to name his prior felony convictions. He responded, "I=m not exactly sure" and "Well, I=m not for sure what." When trial counsel asked the more pointed question, "Have you ever been in the last 10 years convicted of a felony," Bishop replied, "Last 10 years, I don=t think so. I=m not sure." Simply stated, it is highly unlikely that the petitioner's jury was favorably impressed with Bishop's honesty or reliability.

Based upon the strength of the state's case and Bishop's evident mendacity, confidence in the jury's verdict is not undermined. The failure to establish the "materiality" of

the favorable evidence thus defeats the petitioner's due process claim premised on the prosecution's suppression of exculpatory evidence.

## III. **Prosecutorial Misconduct.**

As we understand the petitioner's final complaint, he insists that Bishop gave perjured testimony and that the state failed in its duty to correct that testimony. The petitioner's claim is based on the following exchange between trial counsel and Bishop during cross examination:

> Q.    Have you ever worked for the police before in the past, given them information that's helped you out in some of the sentencing, some of the things you don't remember you did?
>
> A.    No, sir.

The petitioner supports his allegation that Bishop perjured himself by reference to a 1994 federal appellate unpublished disposition in which Bishop's name appears and in which he is described as a government witness and prison inmate who gave testimony that the appealing defendant had threatened his life. *See United States v. Johnson*, 16 F.3d 1222 (6th Cir. 1994) (unpublished disposition). As we shall explain, the petitioner=s claim must be rejected.[3]

It is settled that the state may not present false testimony and that the state has an affirmative duty to correct false testimony presented by state witnesses. *See State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). To obtain a new trial, the defendant must demonstrate that the state presented false testimony, that the state knew the testimony was false, and that the testimony was material. *State v. Cureton*, 38 S.W.3d 64, 74-75 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 2000). A different measure of materiality, however, applies in that context, and the inquiry becomes whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972).

If a witness has received or been promised government-supplied benefits or some favorable consideration in exchange for testifying against a defendant, that information is exculpatory in its tendency to impeach the witness' credibility and motive for testifying. *Giglio*, 405 U.S. at 154-155, 92 S. Ct. at 766; *Hartman v. State*, 896 S.W.2d 94, 101 (Tenn. 1995). Bishop testified in his direct testimony about the reason he contacted Detective Coarsey to offer

---

[3]  The post-conviction court never specifically addressed the perjury claim, although it is evident from the memorandum and order denying post-conviction relief that the court understood that the petitioner was arguing that Bishop=s testimony was perjured.

information about the petitioner's statements: "Well, I thought about my daughter almost got burned up one time. That's when I went to talk to somebody." Bishop, also, was asked on direct examination about and denied having been promised anything in return for his testimony. Then on cross-examination, trial counsel asked if Bishop had ever previously worked for the police and provided information that benefitted him in sentencing. These questions, we note, are directed at two different issues: (1) Bishop's past "working" relationship with the police, not involving testimony as witness, and (2) Bishop's testimony at the petitioner's trial.

We find no evidence in the record before us that Bishop worked with law enforcement prior to the petitioner's trial or that based on information he provided, he received some sentencing consideration. The only enlightenment we discern from the unpublished disposition in *Johnson* is that Bishop, a prison inmate at the time, testified that Johnson, who was charged with conspiracy and distribution of cocaine, had threatened his life. We find no suggestion in the unpublished disposition that Bishop received any benefit or consideration in exchange for testifying against Johnson. Similarly, we have reviewed an NCIC report on Bishop that the petitioner filed as a post-conviction exhibit. That report contains no information about any "deals" or preferential treatment that Bishop may have received from law enforcement in the past.

Whether Bishop was promised or received any consideration for his testimony against the petitioner, however, is more complicated. We begin with what the record before us does and does not reveal. Included as a post-conviction exhibit in this case is a transcript of the November 19, 1993 hearing on the petitioner's new trial motion. At that hearing, several affidavits were offered and accepted by the trial court without objection. Of interest to the present inquiry are (a) the affidavit of Bishop's defense attorney, who represented him on the Tennessee charges pending at the time Bishop testified against the petitioner, and (b) the affidavit of a prosecuting attorney in Waco, Texas, who had been assigned to prosecute Bishop on Texas charges also pending when Bishop testified for the state at the petitioner's trial.

The state submitted the affidavit of Bishop's defense attorney. The affidavit states that Bishop pleaded guilty in Sumner County on January 12, 1993 to theft over $1,000, filing a false police report, and failure to appear. The affidavit also recites that Bishop was sentenced on March 26, 1993, at which time he was sentenced to time served, which was approximately seven months. Defense counsel states in the affidavit that at the time Bishop was sentenced, there was a "hold" on him from Texas such that it was expected that Bishop would be extradited to Texas. The concluding paragraph recites,

> That the defendant testified on behalf of the State in a case styled *State v. Lewis* on March 9, 1993. There was no agreement or deal between the defendant and the State of Tennessee with regard to the length or type of sentence he would receive if he testified for the State.

-13-

The petitioner's counsel at the new trial motion hearing submitted the affidavit of the Texas Assistant District Attorney General assigned to Bishop's charges. Prosecution counsel affirmed in the affidavit that while Bishop was incarcerated in Sumner County, a "hold" was placed on him to ensure his appearance in a Waco, Texas criminal court. According to the affidavit, the Sumner County Sheriff's Department requested that the hold be lifted because Bishop needed to be hospitalized, which evidently could not occur unless the hold was removed. The Texas Assistant District Attorney General honored the request. The next paragraph of the affidavit states,

> 4. Later, I was informed that Mr. Bishop had testified in a case in State court, Sumner County, Tennessee, and that because of his testimony, Tennessee was either going to dismiss the Tennessee charges against him, or place Bishop on probation.

The affidavit concludes that after the hold was lifted and the Tennessee charges "disposed of," Bishop absconded the jurisdiction and did not surrender in Texas.

At the hearing to consider the new trial motion, the parties represented to the trial court that, despite their earnest efforts, Bishop could not be located. The trial court was not persuaded that the Texas affidavit demonstrated that Bishop had been promised early release in Tennessee in exchange for his testimony, and the court rejected that ground for a new trial. On direct appeal, our court ruled that the issue whether Bishop had received special consideration in exchange for his testimony had been waived as not supported by fact or legal authority. *Roger Lewis*, No. 01C01-9404-CR-00135, slip op. at 6.

As previously indicated, the affidavits resurface as post-conviction exhibits. Also appearing as post-conviction exhibits are certified copies of Bishop's Tennessee plea agreement, a motion to continue Bishop's sentencing, an agreed order continuing the sentencing hearing, and the judgments of conviction. From these pleadings we discern that Bishop's plea agreement, *which was accepted prior to the petitioner's trial*, provided that he would plead guilty to three charges, that he would be treated as a Range I standard offender, that the length of his sentences would be determined by the trial court, and the "state [would] ask for defendant to serve 8 months." The motion to continue sentencing was filed by Bishop's counsel on February 22, 1993, prior to the petitioner's trial, and an agreed order was entered the following day. As grounds for continuing the sentencing hearing, the motion recites that Bishop would be testifying for the state at the petitioner's trial and that Bishop's "cooperation and truthful testimony . . . should be a factor to be considered by the Court at [Bishop's] sentencing hearing." The motion further states that the state agreed to the continuance. Bishop was sentenced on March 26, 1993, and the judgments reflect that he was given sentencing credit for approximately six months pretrial confinement and was placed on supervised probation, effective immediately.

-14-

In addition to the foregoing exhibits, the petitioner introduced, without objection or authentication, a video tape of purported trial testimony given by Bishop in 1998 as a prosecution witness in a Kentucky homicide case. We have reviewed that video tape, and on the tape a person identified as Ernest Bishop is cross-examined at length about his prior convictions, aliases, and testimony in other cases. Bishop was questioned about testifying in other cases, and he admitted testifying, *inter alia*, at the petitioner's trial. Bishop hesitated when asked if that testimony was part of a "deal." He responded that "they helped me get probation." Bishop also, however, adamantly insisted that he did not make a "deal" before he testified in the petitioner's case; rather, Bishop explained that he was "hoping" that he would "get something" for his testimony.

From the record, the obvious first question is whether this claim has been "previously determined" such that post-conviction review is inappropriate. *See* Tenn. Code Ann. ' 40-30-206(f) (1997). Post-conviction proceedings may not be employed to raise, relitigate or review questions decided and disposed of in a direct appeal from a conviction, and Code section 40-30-206(h) addresses the concept of previous determination.

> A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

*Id*. ' 40-30-206(h) (1997). Here, the petitioner presented the issue whether Bishop was promised or received any consideration for his testimony against the petitioner as a ground for relief in both the motion for new trial and on direct appeal. The trial court accepted evidence from the parties on this issue and rejected it. We find no evidence in the record that the petitioner was denied "a full and fair hearing." That Bishop could not be located did not deprive the petitioner of the opportunity to litigate the issue. We note that the petitioner could have introduced the pleadings related to Bishop's plea agreement and sentencing, which predated the November 19, 1993 hearing on the petitioner's new trial motion. The petitioner also could have subpoenaed members of the prosecution team regarding any promises made to Bishop. The petitioner waived the issue on direct appeal, thereby rendering the trial court's ruling final. Accordingly, in our view this issue has been previously determined by the original trial court and is not subject to further review by this court.[4]

Even if this issue were properly before us, however, we would reject it based on the petitioner's failure to provide the requisite clear and convincing evidence to support it. *See* Tenn. Code Ann. ' 40-30-210(f) (1997). The petitioner has not demonstrated, in the first

---

[4]The post conviction court did not directly address this issue.

-15-

instance, that Bishop perjured himself when he denied having been promised anything in exchange for his testimony. There is a significant difference between a promise to the witness of favorable treatment and a witness' unilateral expectation or hope of later favorable treatment. *See State v. Gregory Robinson*, W2001-01299-CCA-R3-DD, slip op. at 24 (Tenn. Crim. App., Jackson, Aug. 13, 2003). ("While [the witness] may have hoped that his testimony would result in favorable treatment, the record does not establish that an agreement existed between the state and [the witness] at the time of the defendant's trial. . . . Furthermore, the fact that [the witness] later pled guilty to a lesser charge of facilitation of the offenses does not establish the existence of a prior agreement").

In the present case, it was Bishop -- not the prosecutor -- who filed the motion to continue his Tennessee sentencing hearing until after he testified in the petitioner's case. Bishop, in other words, was promoting his cooperation and truthful testimony as positive factors for the sentencing court to take into consideration. Bishop's Tennessee counsel gave an affidavit denying that there was any agreement or deal for consideration in exchange for Bishop's testimony. That assertion is by no means inconsistent with the statement in the Texas affidavit that Tennessee was going to help Bishop because of his testimony. In his purported video taped testimony, Bishop maintained that he was "hoping" to "get something" for his testimony against the petitioner. That statement, likewise, does not contradict his testimony at the petitioner's trial that he was not promised anything in exchange for his testimony. Neither the state nor the petitioner's trial counsel inquired whether Bishop *expected* that his testimony would improve his lot in life notwithstanding the absence of a formal agreement with the state.

Consequently, even if this claim were appropriate for post-conviction consideration, the petitioner has failed to demonstrate that Bishop perjured himself during the petitioner's trial, which also disposes of any due process claim that the state sanctioned perjury.

## IV. <u>Conclusion.</u>

Our exhaustive review of this record convinces us that the petitioner was not denied constitutionally effective of assistance of counsel and was not convicted in violation of due process on the grounds of suppression of exculpatory evidence or perjured testimony solicited by the state. We, therefore, affirm the denial of the petitioner's request for post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE